[No. D046617. Fourth Dist., Div. One. Mar. 16, 2007.]

DAVID OHTON, Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY
et al., Defendants and Respondents.

752

## Counsel

Schoville & Arnell, Dennis A. Schoville, Louis G. Arnell, James S. Iagmin; Ross, Dixon & Bell, Jon R. Williams and Lindsay J. Reese for Plaintiff and Appellant.

Rothner, Segall & Greenstone, Glenn Ellis Rothner and Bernhard Rohrbacher for California Faculty Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Gordon & Rees, Christopher B. Cato and Eric M. Volkert for Defendants and Respondents.

## Opinion

**O'ROURKE, J.**—David Ohton, a strength and conditioning coach at San Diego State University (SDSU), a California State University, filed an internal administrative complaint alleging that the head football coach, Tom Craft, and other members of the athletic department retaliated against him in violation of the California Whistleblower Protection Act (CWPA) (Gov. Code,[1] § 8547 et seq.) because he reported to a university auditor information critical of various athletic department personnel and practices. The Board of Trustees of the California State University (CSU) investigated Ohton's complaint and timely issued a final decision. Ohton subsequently filed a civil action against CSU and six individually named defendants and sought "economic, non-economic damages according to proof," and "punitive damages as provided by law."

[1] All statutory references are to the Government Code unless otherwise stated.

Defendants moved for summary judgment, arguing Ohton was prohibited from bringing the civil action because (1) CSU timely addressed his complaint under section 8547.12,[2] subdivision (c); (2) Ohton failed to challenge CSU's decision through a writ of mandate; and (3) he failed to exhaust administrative remedies. The court granted the motion on the sole basis that CSU timely addressed Ohton's complaint.

---

[2] Section 8547.12 states in part, "(a) A California State University employee, including an officer or faculty member, or applicant for employment may file a written complaint with his or her supervisor or manager, or with any other university officer designated for that purpose by the trustees, alleging actual or attempted acts of reprisal, retaliation, threats, coercion, or similar improper acts for having made a protected disclosure, together with a sworn statement that the contents of the written complaint are true, or are believed by the affiant to be true, under penalty of perjury. The complaint shall be filed within 12 months of the most recent act of reprisal complained about.

"(b) Any person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a California State University employee, including an officer or faculty member, or applicant for employment for having made a protected disclosure, is subject to a fine not to exceed ten thousand dollars ($10,000) and imprisonment in the county jail for up to a period of one year. Any university employee, including an officer or faculty member, who intentionally engages in that conduct shall also be subject to discipline by the university.

"(c) In addition to all other penalties provided by law, any person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a university employee, including an officer or faculty member, or applicant for employment for having made a protected disclosure shall be liable in an action for damages brought against him or her by the injured party. Punitive damages may be awarded by the court where the acts of the offending party are proven to be malicious. Where liability has been established, the injured party shall also be entitled to reasonable attorney's fees as provided by law. However, any action for damages shall not be available to the injured party unless the injured party has first filed a complaint . . . and the university has failed to reach a decision regarding that complaint within the time limits established for that purpose by the trustees. Nothing in this section is intended to prohibit the injured party from seeking a remedy if the university has not satisfactorily addressed the complaint within 18 months.

"(d) This section is not intended to prevent a manager or supervisor from taking, directing others to take, recommending, or approving any personnel action, or from taking or failing to take a personnel action with respect to any university employee, including an officer or faculty member, or applicant for employment if the manager or supervisor reasonably believes any action or inaction is justified on the basis of evidence separate and apart from the fact that the person has made a protected disclosure.

"(e) In any civil action or administrative proceeding, once it has been demonstrated by a preponderance of the evidence that an activity protected by this article was a contributing factor in the alleged retaliation against a former, current, or prospective employee, the burden of proof shall be on the supervisor, manager, or appointing power to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in protected disclosures or refused an illegal order. If the supervisor, manager, or appointing power fails to meet this burden of proof in an adverse action against the employee in any administrative review, challenge, or adjudication in which retaliation has been demonstrated to be a contributing factor, the employee shall have a complete affirmative defense in the adverse action."

Ohton contends he was entitled to bring the civil action because, notwithstanding CSU's timely administrative decision, his claim of retaliation was not "satisfactorily addressed" within the meaning of section 8547.12, subdivision (c); he was not required to challenge CSU's decision through a writ of mandate because CSU's proceedings were not conducted in good faith and did not provide him adequate due process;[3] and he was not required to exhaust the administrative remedy before alleging new acts of retaliation in the civil lawsuit. We address each of Ohton's contentions, notwithstanding the limited nature of the trial court's ruling, because the parties fully briefed each contention in the trial court and on appeal.[4] We agree with Ohton that the court erred in finding that CSU satisfactorily addressed his complaint. We reverse and remand the matter with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND

*Ohton's Administrative Complaint*

We summarize Ohton's allegations of retaliation as set forth in the August 2003, administrative complaint and the civil complaint. In 2002, Michael

---

[3] In 2002, CSU implemented section 8547.12, subdivision (c) by issuing Executive Order No. 822 (EO 822), which "establishes a procedure for responding to complaints filed with the Office of the Chancellor or CSU campuses by employees or applicants for employment who allege they have been retaliated against for having engaged in protected disclosure under the [CWPA]." The purpose of EO 822 is "to provide a timely and effective procedure for the resolution of such complaints."

Under EO 822, the vice-chancellor of human resources is designated to receive and make decisions regarding written complaints of retaliation. At the vice-chancellor's discretion, the investigation may be conducted by an external investigator. The complainant is obligated to cooperate with the investigator, and in an initial interview with the investigator has the opportunity to present a list of witnesses and documentary evidence in support of the complaint. The investigator must interview the complainant, review any supporting documentation supplied by the complainant and any response to the complaint supplied by the campus, or employees alleged to have taken retaliatory action, interview witnesses, and take any other action the investigator deems appropriate. The investigation must be completed no later than 60 days prior to the expiration of 18 months from the date the complaint was filed. "The vice chancellor for human resources shall transmit the summary and conclusion of the investigation to the complainant within ten (10) days of the vice chancellor's receipt of them from the investigator(s). The complainant may file a written response to the summary and conclusion with the vice chancellor within fourteen (14) days of receipt of the summary and conclusion." Thereafter, "The vice chancellor of human resources shall respond to the complainant with a letter of determination within fourteen (14) days of receipt of the complainant's written response or the expiration of the time limits for the complainant to file a response . . . . This letter of determination will constitute the final CSU decision regarding the complaint, pursuant to . . . section 8547.12(c)."

[4] " 'As a corollary of the de novo review standard, the appellate court may affirm a summary judgment on any correct legal theory, as long as the parties had an adequate opportunity to address the theory in the trial court.' " (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22 [4 Cal.Rptr.3d 785].)

Redmond, director of CSU's office of auditors, initiated an audit of the athletic department and sought input from the departmental personnel. Ohton relied on Redmond's assurances of confidentiality and in October 2002, he reported that various members of the athletic department engaged in "serious mishandling and [misappropriation] of athletic department property." In February 2003, Ohton responded to Redmond's requests for additional information with a 103-page, wide-ranging report (Ohton Report) that alleged, among other things, violations of the rules of the National Collegiate Athletic Association (NCAA) regarding the conduct of football practices. Ohton also reported to Redmond that he did not travel with the SDSU Aztecs football team to out-of-state games during the 2002–2003 season, but a team booster told him that he saw Craft drunk in public the night before one such game. The auditor's report was issued on April 30, 2003.

On May 9, 2003, CSU's president issued a memorandum to the department of athletics employees that stated, "As we begin to receive more specific information with regard to the auditor's findings, it is *possible* that information will emerge about colleagues in the department that have been interviewed by the auditor. I want to make it absolutely clear that there must be no retaliation in any way against people who have done a public service to the citizens of California, to this university, and to the department of athletics by calling these problems to the attention of the auditor. I want everyone on notice that if there are any retaliatory actions taken toward employees who have cooperated in this audit, those retaliating will be subject to disciplinary action."

On the subject of reprisals or retaliation, Ohton alleged that by the second week of June 2003, the department personnel managed to identify him as someone who cooperated with the audit, and Craft obtained a copy of Ohton's confidential report and circulated it to others in the athletic department; consequently, the individual defendants retaliated against Ohton in differing ways. Specifically, in the last week of June 2003, Craft met with the football team and asked the members about their opinions of Ohton's performance as strength coach because, Craft claimed, Ohton had "turned in" their program to the NCAA, and "was out to get them." According to Ohton, Craft told them, "Ohton is trying to fuck me and I'm going to fuck him twice." Also, despite an earlier understanding that Ohton would assist with two high school football camps in July 2003, he was not invited to participate in the camps.

Tom Kaumeyer, the football team's defensive coordinator, asked the director of baseball operations his opinion of Ohton, and received a positive response; nonetheless, Kaumeyer manifested his desire to have Ohton removed. On July 18, 2003, two football players told Ohton's assistant, Courtney Bale, that "Ohton needed to get on board with Craft's system or he would be fired soon."

On July 31, 2003, the interim athletic director, Gene Bartow, informed Ohton that Craft wanted his own strength and conditioning coach; therefore, the department would hire a new coach who would report only to football. Bartow tried to convince Ohton to go along with this idea, but Ohton replied this was clear retaliation arising from revelations contained in the Ohton Report.

On August 5, 2003, Craft met with certain football players and instructed them not to talk to Ohton or consult with him about strength and nutrition matters. That same evening, the football program hosted the annual "Big-50" booster dinner, but Ohton was not invited.

On August 6, 2003, Bartow met with Ohton and told him football was a family and he was no longer part of that family; accordingly, Ohton was relieved of all field responsibilities for football; he would no longer stretch the team or be on the field for any responsibilities effective immediately. On August 11, 2003, Ohton learned that SDSU's director of football operations, Dave Powroznik, had visited the coaches for women's soccer and men's golf to ask for a decision to remove Ohton. On August 19, 2003, Rhan Sheffield took over Ohton's strength responsibilities for football. On August 20, 2003, Bartow, in a heated exchange with Ohton, discussed Sheffield's hire and directed Ohton to work from 6:00 a.m. to 2:00 p.m. because, "This way you won't be around the football players or the coaches. These guys don't want you around them."

*CSU's Investigation*

CSU took the following steps to address Ohton's administrative complaint: On September 5, 2003, the vice-chancellor for human resources, Jackie McClain, wrote Ohton acknowledging receipt of the complaint. On September 19, 2003, CSU formally retained outside counsel, John Adler, as investigator. Adler interviewed Ohton in the presence of Ohton's attorney both at the start and near the end of his investigation, reviewed Ohton's written submissions, and interviewed some witnesses Ohton identified. Adler's report was submitted to McClain on October 31, 2003.

Adler's report stated that the auditor's inquiry focused on equipment room improprieties, specifically, whether there were "shoes going out the back door." Adler determined CSU did not retaliate against Ohton in any way because Ohton's Report did not constitute a "protected disclosure" within the meaning of section 8547.12.[5] Adler delimited the scope of his investigation and conclusions in a section of his report titled, "Statement of Issues Considered and Conclusions Regarding Retaliation." Adler first addressed Ohton's claim that his services were not used for two high school football camps. Adler concluded Ohton's exclusion from the camps was not improper because he was not a "football coach"; moreover, no compensation was paid to any participating coach.

Adler next addressed Ohton's claim that he was removed as strength coach from the football program because he reported NCAA rule violations. Adler concluded, "Some of the personal and program-related allegations and accusations set forth by Mr. Ohton in [the Ohton Report] were a factor in Ohton being removed as the strength and conditioning coach for football. However, the allegations and accusations concerning equipment room improprieties, the specific focus of Mr. Redmond's audit and report, were not a factor and were irrelevant to the removal decision."

As for Ohton's claim he was not invited to the annual "Big-50" booster function, Adler concluded, "The booster function is held at the time student-athletes report for training in August. Coaches are expected to attend this after-practice dinner. As of August 2003, the date of the event, Mr. Ohton was no longer part of the football program. The presence of Mr. Ohton would have been inappropriate as a result of prior decisions made by the University."

[5] Section 8547.2 defines several terms used in section 8547.12, including the term "protected disclosure," which "means any good faith communication that discloses or demonstrates an intention to disclose information that may evidence (1) an improper governmental activity or (2) any condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition." (§ 8547.2, subd. (d).)

Ohton's Report is described by Adler as a "broad-based challenge to athletic department management . . . containing data dating back, in some cases, over a decade. Much of the Ohton Report addresses internal decisions by others that Ohton characterizes as worn or 'gray'; much of the report addresses past grievances that have been long-resolved; and much of the report addresses Ohton's personal goals, accomplishments, philosophy and opinions." Adler continued, "The context of the Ohton Report is the most puzzling element. By January, 2003, the auditor had already completed his interviews and was known to be focusing only on the equipment room issues. Ohton had little first hand knowledge of such matters. . . . It was as if Ohton saw the equipment room audit and his access to Redmond, as an opportunity to air all of his complaints, some a decade old, to a CSU official. And, it appears that the purpose of this airing of grievances was primarily personal. The over-arching context is that the people making athletic department decisions are incompetent, vindictive, manipulative and/or self-promoting—they should not have been hired and should be immediately removed."

Ohton also claimed retaliation based on his reduced work hours and order to leave the campus by 2:00 p.m. daily. Adler concluded this restriction "was a re-assignment and job modification taken against Mr. Ohton due to his refusal to voluntarily relinquish football responsibilities and due to the perceived antagonism of Mr. Ohton towards the current football program, as illustrated by some of the allegations and accusations in the Ohton Report." Adler elaborated in another section of his report that Bartow's stated reason for this action was, "the relationship between Coach Craft and Coach Ohton seem[ed] to be strained beyond a tolerable level." According to Adler, "The time restriction on Ohton had the effect of adversely impacting the ability of Ohton to work with sixteen athletic teams, other than football, and served as a punitive, message-packed restriction: don't mess with football. This unnecessary, demeaning act was in response to Ohton's rejecting Bartow's request that he voluntarily relinquish football responsibilities and in response to Craft and Powroznik's desire to keep Ohton far away from the football student-athletes to prevent Ohton from obtaining information and prevent Ohton from undermining the coaches. . . . By all accounts, even if Ohton remained in the weight room and on campus until 5:00 p.m. each day, he would not encounter the football student-athletes, who are on the field until 5:15 p.m. or later each practice day."

Ohton claimed additional acts of retaliation in the Ohton Report; specifically, "threat to job by former Athletic Director Rick Bay for Mr. Ohton's truthful answers to NCAA investigator's questions; [and] inaccurate performance evaluation and unwarranted issuance of counseling Memorandum." Adler concluded, "Mr. Ohton relates numerous allegations and accusations of wrongful conduct, including events that extend back in time for over a decade. Although Mr. Ohton contends he raised such issues in a timely fashion, his responsibility to do so extended beyond casual comments to his supervisors. Mr. Ohton's long-term gathering of data and insufficient, or non-disclosure, of such information caused the performance evaluation to be written as it was, and caused the Memorandum to be issued. Further, Mr. Ohton was not the only employee to be issued a counseling Memorandum; thus, he was not singled-out for such treatment. As to the alleged threat by Mr. Bay, his resignation in May, 2003, and his non-influential status as to the University, has eliminated the possibility of any adverse action being attributable to any such threat, even if made. This issue is, therefore, moot."

Ohton claimed SDSU failed to honor its contract with supplemental payments of $6,000. Adler concluded, "Any delay was due to the University's concern about entitlement, characterization and source of funds. This matter is no longer in issue. The supplemental payments were incorporated into Mr. Ohton's base salary, no losses have been sustained and Mr. Ohton has benefited from this new compensation structure."

Finally, Ohton claimed, in an October 6, 2003, letter to CSU's president, that Mike Bohn, the incoming athletic director, was influenced against Ohton in a way that was inappropriate and unwarranted. Adler concluded, "With no prejudice to the position or rights of Mr. Ohton, Mr. Bohn was advised of pending athletic department issues, including the football team's change regarding its strength and conditioning program. Mr. Bohn also received favorable comments from athletic department personnel concerning Mr. Ohton. Mr. Bohn approaches his position with no adverse feelings or opinions concerning Mr. Ohton."

Adler found that "[s]everal months after Redmond's receipt of the Ohton Report the matters were brought to the attention of the campus and investigated internally. As a result, certain highly-placed individuals came to learn of Ohton's identity as the source of the allegations. However, direct disclosure of Ohton as the whistleblower did not occur until reported in the media around July 30, 2003, following the media's access to Redmond's investigative files. Prior to that time, the personal and program-related issues raised by Ohton were being investigated and the issues raised caused those in the football program to reasonably believe that Ohton, at least in part, was the source."

McClain forwarded Adler's report to Ohton on November 5, 2003. On December 1, 2003, McClain received Ohton's seven-page response requesting that CSU disregard Adler's conclusions and reopen the investigation, find that Ohton's disclosures were protected, and immediately produce Adler's entire investigation file. McClain forwarded Ohton's letter to Adler for his response and also sought clarification of certain issues mentioned in Adler's report. Adler replied to McClain in a 10-page letter. McClain sent CSU's final decision letter to Ohton on December 19, 2003.

Contrary to Adler, McClain determined Ohton's Report was a protected disclosure. She wrote to Ohton, "In this case, according to Mr. Adler, your written audit statement was primarily personal in nature and touched upon statutorily protected matters in only a most limited sense and are, as a whole, unprotected. Although I don't entirely disagree with this characterization of your written audit statement, I take note of Mr. Redmond's communication with you that led you to conclude your statement was protected. Specifically, I note you submitted your table of contents to him prior to submitting your statement, and that he pursued various issues through follow-up questions on many more issues than the 'shoes going out the back door' mentioned in Mr. Adler's report. I also note you asked for and received assurances from Mr. Redmond that you could not be retaliated against for your participation in the audit. Based on these facts, including some information possibly unknown to Mr. Adler, I disagree with Mr. Adler's conclusion that your written audit statement as a whole is not a 'protected disclosure.'

"That being said, I do not agree that everything an employee says in the course of an official investigation is under all circumstances, a protected disclosure. Generally, I disagree with the principle that false information knowingly and maliciously given is protected disclosure merely because it was communicated to an investigator or an auditor."

Relying on the above caveat, McClain concluded Ohton's disclosure regarding his allegation Craft was seen drunk in public was not protected disclosure. She wrote, "Vice President Sally Roush, justifiably concerned about potential misconduct, personally examined this allegation and concluded it was inaccurate and false. According to . . . Roush, [Ohton] admitted only one booster brought this alleged incident to [his] attention, not the 'few' specifically mentioned in [Ohton's] written statement. When . . . Roush contacted this booster, he denied having 'seen' the alleged incident and referred . . . Roush to other individuals, who also denied witnessing any such incident. . . . Roush nevertheless interviewed SDSU employees who traveled with the football team to ask whether they had any information about the coach drinking before games. . . . Roush concluded this incident did not happen. Based on the information provided by Mr. Adler and a separate interview of . . . Roush, by Ms. Maria Santos, [s]enior [d]irector of [e]mployee [r]elations, I am confident that . . . Roush's inquiry and her conclusion were reasonable.

"I can think of no legitimate reason for you to distort the truth in this manner, particularly with respect to an inflammatory accusation that could ruin a coach's career. It lends credence to Mr. Adler's conclusion that you were pursuing a personal and vindictive agenda against Coach Craft."

McClain also concluded Ohton was removed as strength and conditioning coach for the football team for independent, legitimate, nonretaliatory reasons. She explained, "Mr. Adler concluded the decision to remove you as strength and conditioning coach for the football team and restricting your hours on campus were based, at least in part, on specific comments contained in your written audit statement. Specifically, your factually false comments about the coach's intoxication at an away game were central to the University's decision to take the action it did.

"I have previously concluded that your comments about Coach Craft were factually false, not made in good faith and therefore not 'protected disclosures.' The decisions to remove you as the strength and conditioning coach of the football team and restrict your hours in the weight room and on campus

were based in part on these comments and therefore are not retaliatory. Further, in the summer of 2003, a movement existed within the SDSU Athletic Department, and specifically the football program, to remove you as strength and conditioning coach for football or not renew your employment with the University. Mr. Adler's report found that in his first meeting with the Interim Athletic Director Bartow, Coach Craft stated that he wanted 'his own people in the field,' wanted to develop his players' speed and quickness, and wanted 'different strength and conditioning.' Although you were not removed as football strength and conditioning coach at that time, Interim Director Bartow subsequently asked you to 'voluntarily' relinquish your football responsibilities. When you refused, he removed you from any involvement with football and advised you that your new work hours would be from 6:00 a.m. to 2:00 p.m., Monday through Friday. He further directed you to be out of the weight room by 2:00 p.m. daily.

"According to Mr. Adler, Interim Director Bartow made this organizational change also because 'the relationship between Coach Craft and Coach Ohton seems strained beyond a tolerable level.' Coach Craft knew from the time he was hired that you did not support his appointment, something you do not deny. Furthermore, he determined within a few months as coach that you were opposed to his retention of offensive line coach Damon Baldwin. The tension between you and Mr. Baldwin was apparent to the other coaches and to the players, and negatively impacted the football program. [¶] . . . [¶]

"Mr. Adler corroborated Coach Craft's assertion that he wanted to change the emphasis of the football team's conditioning, that you were unwilling to support this change in emphasis, notwithstanding several chances to do so and that you had a general antipathy toward the coach, all of which predates the audit. All of these support the decision to replace you as strength and conditioning coach for the football team. I also note that you remain conditioning coach for the other teams, whose coaches are comfortable with this arrangement."

However, McClain determined that the decision to reduce Ohton's work hours was "minor retaliation." In her words, "Mr. Adler concluded that the decision to restrict your hours in the weight room and on campus was based in part on comments contained in your written audit statement as well as your refusal to 'voluntarily' relinquish football. This decision was ostensibly to prevent you from interacting with the football players. Mr. Adler, however, learned that the players practiced until 5:15 [p.m.] or later and were required to workout in the weight room after practice. He therefore concluded that this action was primarily punitive and in response to your non-protected refusal to relinquish football. *However, I have concluded you did engage in protected disclosure and since there is no legitimate business reason for this action, I conclude changing your hours was retaliatory.*"

It is undisputed that CSU formally reinstated Ohton's hours of access to the weight room and campus on February 4, 2004. Ohton did not challenge the university's final decision by filing a petition for a writ of mandate.

*Ohton's Civil Complaint and the Summary Judgment Motion*

On February 13, 2004, Ohton filed a civil complaint that alleged a single cause of action: retaliation in violation of section 8547 et seq. The complaint was based on essentially the same facts addressed in Ohton's administrative complaint. It also reiterated additional facts, first adduced in Ohton's letter to McClain in response to Adler's report, regarding Ohton's contention CSU conducted an "inadequate and incomplete investigation." The complaint also mentioned that CSU failed to take any disciplinary action in response to its finding of minor retaliation, and continued to retaliate against him after the conclusion of the investigation.

Defendants filed motions for summary judgment on the grounds that CSU had timely addressed Ohton's administrative complaint and that Ohton's complaint was barred by his failure to exhaust his judicial and administrative remedies.[6]

Ohton's opposition included a declaration, dated February 5, 2004, by a booster who affirmed that in the summer of 2003, he witnessed Craft's public drunkenness. He informed Roush about it in response to her inquiry in a phone call she made to him. The booster declared, "I told Ms. Roush what I knew. She told me that she wanted me to come in and sign documents. I explained to Ms. Roush that I would provide this testimony confidentially to her, but only if the others, the administrative employees in the athletic department who would corroborate my information, failed to come forward. I was hesitant to come forward, because I had a son who played high school football and I wanted him to be recruited by SDSU. I explained this to Ms. Roush and I thought she would be sensitive to my situation." The booster later learned from members of the athletic department that Roush had breached his confidence. He was angry and left a telephone message to Ms. Roush saying so, but he never heard from her again.

In addition, Ohton provided deposition testimony of Maria Medina Santos, CSU's senior director of employee relations, in which she stated she prepared the initial draft of McClain's final decision letter to Ohton, which stated, "Ultimately the one booster who admitted conveying this information [regarding allegations of Craft's public drunkenness] to you, after equivocating,

---

[6] One summary judgment motion was filed on behalf of Kaumeyer, Craft, and Powroznik. A separate joint motion was filed on behalf of all defendants.

refused to cooperate with the investigation." McClain's final report replaced this statement with, "When Vice President Roush contacted this booster, he denied having 'seen' this alleged incident and referred Vice President Roush to other individuals, who also denied witnessing any such incident." Medina Santos testified she did not recall the reason for the changed language in the final draft.

Further, Ohton provided deposition testimony of Adler conducted in discovery in the civil suit, that he assigned a preponderance of the evidence burden of proof to CSU's claim of justification for its decision to remove Ohton as strength and conditioning coach for the football team and reduce his hours.

The court granted summary judgment on the ground that CSU had timely addressed Ohton's complaint.

## DISCUSSION

### I. *Standard of Review*

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) This court applies the same analysis as the trial court. We identify the issues framed by the pleadings, determine whether the moving party has negated the nonmoving party's claims, and determine whether the opposition has demonstrated the existence of a triable issue of material fact. Summary judgment is appropriate if all the papers submitted show there is no triable issue of fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

We review issues of statutory construction de novo. (*Amdahl Corp. v. County of Santa Clara* (2004) 116 Cal.App.4th 604, 611 [10 Cal.Rptr.3d 486].) "Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists

consideration should be given to the consequences that will flow from a particular interpretation." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

The term "satisfactorily addressed" is not defined in the statute. To begin, we reject CSU's interpretation of the term, "satisfactorily addressed," which it purports to base on legislative history. CSU claims the term "must be interpreted as simply requiring that the complaint be addressed and a decision reached under the applicable administrative procedures within 18 months." Under this interpretation, in effect, the words "satisfactorily addressed" are read out of the statute, and instead, the narrow focus is on CSU's timely completion of the investigation.

## II. *Section 8547.12*

We recognize the legislative history of section 8547.12 subdivision (c) states the CSU whistleblower protection statute should track section 8547.10, subdivision (c), which applies to employees of the University of California.[7] Specifically, the Report of Assembly Committee on Consumer Protection, Government Efficiency and Economic Development on Senate Bill No. 2097 (1993–1994 Reg. Sess.) states, "This bill would set up an in-house grievance procedure and legal remedies for CSU employees who suffer reprisal for disclosing improper governmental activities *similar to that provided to University of California employees.*" (Italics added.) Although section 8547.12, subdivision (c) is almost identical to section 8547.10, subdivision (c),[8] Ohton and amicus curiae[9] point out section 8547.12, subdivision (c) differs in one significant regard—it alone contains the provision that the complainant may seek a remedy if the university has not "satisfactorily addressed" the complaint. Therefore, the cases CSU relies upon that interpret section 8547.10, subdivision (c) are not dispositive.[10] For these reasons, we

---

[7] We grant respondents' request for judicial notice of the legislative history of section 8547.12, subdivision (c), filed March 1, 2006.

[8] Section 8547.10, subdivision (c) states in part, "Any action for damages shall not be available to the injured party unless the injured party has first filed a complaint with the university officer . . . and the university has failed to reach a decision regarding that complaint within the time limits established for that purpose by the regents."

[9] An amicus curiae brief was filed on behalf of the California Faculty Association.

[10] The California Supreme Court interpreted section 8547.10, subdivision (c) as follows: "[It] permits aggrieved university employees to file a damages action provided they have followed the administrative procedures and filed an administrative complaint before filing their lawsuit. [Citation.] Of note here, the employee may not proceed with a court action against the university unless that institution has failed to reach an administrative decision on the action within specified time limits. [Citation.] In such a case, the employee may file a lawsuit for damages even though the administrative complaint is pending. If, by contrast, the university

agree with Ohton that the court erred in concluding that CSU had timely addressed the complaint, and Ohton was therefore barred from pursuing a civil remedy for damages.

In addressing the meaning of "satisfactorily addressed," Ohton advances two alternative interpretations. The first is labeled as "the subjective satisfaction of the whistleblower. . . . A whistleblower who believes that the decision made by a university does not satisfactorily address his or her complaint would not be precluded from seeking other subsequent remedies." This appears to be a recasting of the only interpretation Ohton advanced before the trial court: "The requirement of a 'satisfactory' result must be in respect to a whistleblower's decision. Otherwise the statute's guarantee of a civil remedy would be meaningless." Ohton's second interpretation asserts "the use of the term 'satisfactorily' in section 8547.12 imputes a clear obligation on CSU to act in objective good faith in fulfilling its duties under the CWPA."

Ohton's subjective interpretation of "satisfactorily addressed" can be rejected out of hand. Such an approach would render the statutory and administrative proceedings mandated by section 8547.12 and EO 822 nugatory; a complainant need only assert that he is unhappy with the decision in order to overturn it. We find no indication that the Legislature intended such a farfetched standard. For reasons detailed below, Ohton may be closer to the mark with his "objective good faith standard."

■ Contrary to Ohton's contention, section 8547.12 does not "guarantee" the complainant a civil remedy. Before a civil complaint for damages can proceed, the complainant is required to establish that CSU has not "satisfactorily addressed the complaint." (§ 8547.12, subd. (c).) Ohton is silent on how this is to be accomplished, either in pleading or procedurally. We are not allowed such latitude.

■ In interpreting the term "satisfactorily addressed" it is critical that we bear in mind that we are dealing with an administrative proceeding. Standards for judging the legal sufficiency of an administrative proceeding are well established under mandamus. "[A] cardinal rule of statutory construction [is]

has reached a decision on the administrative action, the statute does not authorize any statutory damages action." (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 327 [25 Cal.Rptr.3d 320, 106 P.3d 976].)

Ohton and amicus curiae argue that the Supreme Court's reference to section 8547.10, subdivision (c) was dicta. They also note the California Supreme Court granted review of an unpublished opinion (*Miklosy v. Regents of the University of California* (Nov. 28, 2005, A107711) [nonpub. opn.], review granted Jan. 4, 2006, S139133) to resolve whether section 8547.10, subdivision (c) merely requires that a complainant exhaust the internal remedy as a condition of bringing a civil action or if it bars an action for damages when the university timely renders any decision on the complaint.

that the Legislature is presumed to have knowledge of existing judicial decisions and to have enacted statutes in their light." (*Dominey v. Department of Personnel Administration* (1988) 205 Cal.App.3d 729, 742 [252 Cal.Rptr. 620].) There is no reason to conclude either from the words of the statute or its legislative history that the words "satisfactorily addressed" signaled a departure from well-established mandamus standards and procedures.

■ "Judicial review of most public agency decisions is obtained by a proceeding for a writ of ordinary or administrative mandate. [Citation.] The applicable type of mandate is determined by the nature of the administrative action or decision. [Citation.] Usually, quasi-legislative acts are reviewed by ordinary mandate and quasi-judicial acts are reviewed by administrative mandate. [Citation.] [¶] 'Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts.' [Citation.] . . . [A]dministrative mandate is available 'only if the decision[] resulted from a "proceeding in which by law: 1) a hearing is required to be given, 2) evidence is required to be taken, and 3) discretion in the determination of facts is vested in the agency." ' [Citations.] '[O]rdinary mandate is used to review adjudicatory actions or decisions when the agency was not required to hold an evidentiary hearing.' " (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785 [52 Cal.Rptr.2d 466], italics omitted.) "[T]he absence of an evidentiary hearing does not make mandate inapplicable: it merely affects the form of mandate that must be invoked." (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 849 [41 Cal.Rptr.2d 567].)

The standard of review used in an ordinary writ case is abuse of discretion. "The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704]; see also *Horsford v. Board of Trustees of California State University.* (2005) 132 Cal.App.4th 359, 393 [33 Cal.Rptr.3d 644] [quoting *City of Sacramento v. Drew*].) "Unlike the broad scope of review provided in administrative mandamus proceedings, review by ordinary mandamus is confined to an examination of the agency proceedings to determine whether the action taken is arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law." (*Stauffer Chemical Co. v. Air Resources Board* (1982) 128 Cal.App.3d 789, 794 [180 Cal.Rptr. 550].)

Code of Civil Procedure section 1094.5 governs judicial review by administrative mandate of any final order or decision rendered by a state or local

agency. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 137 [93 Cal.Rptr. 234, 481 P.2d 242].) Code of Civil Procedure section 1094.5, subdivision (b) provides that judicial review of such a decision shall "extend to the questions whether the [administrative agency] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [administrative agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

■ The parties have fully briefed the issue of whether Ohton was required to exhaust his judicial and administrative remedies before pursuing an action for damages. We reject Ohton's contention that he was not required to challenge the CSU proceeding and final decision by filing a petition for writ of mandate. There is no indication from the statute or its legislative history that an exception to the requirement for a writ of mandate was contemplated when section 8547.12 was enacted. CSU correctly notes "courts should not presume the Legislature in the enactment of statutes intends to overthrow long-established principles of law unless that intention is made clearly to appear either by express declaration or by necessary implication." (*Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 779 [63 Cal.Rptr.2d 859, 937 P.2d 290].) Abandonment of the mandamus requirement is not implied by the granting of a civil remedy because the statute requires the complainant to establish that CSU has not "satisfactorily addressed" his complaint as a condition precedent to sue for damages. We note that there is no procedural bar to combining a petition for mandamus with a complaint for damages. (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 735 [29 Cal.Rptr.2d 804, 872 P.2d 143] [the court raised no objection to this practice, this case is cited with approval in Cal. Civil Writ Practice (Cont.Ed.Bar 3d Ed. 2006) § 6.54, p. 256].) Further, Ohton's claim that writ proceedings were not contemplated under section 8547.12 must be rejected because such an interpretation would act to deprive many complainants of the protection of the statute. Not all complainants seek only damages: Some may seek only to compel CSU to restore privileges and positions removed by retaliation; others may seek to compel both restoration and damages.

■ The California Supreme Court discussed the purpose of such writ review in terms of exhaustion of judicial remedies as follows: "[I]n *Westlake Community Hosp. v. Superior Court* [(1976)] 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410] . . . , this court held that unless a party to a quasi-judicial proceeding challenges the agency's adverse findings made in that proceeding,

by means of a mandate action in superior court, those findings are binding in later civil actions. This requirement of exhaustion of judicial remedies is to be distinguished from the requirement of exhaustion of administrative remedies. [Citation.] Exhaustion of *administrative* remedies is 'a jurisdictional prerequisite to resort to the courts.' [Citation.] Exhaustion of *judicial* remedies, on the other hand, is necessary to avoid giving binding 'effect to the administrative agency's decision, because that decision has achieved finality due to the aggrieved party's failure to pursue the exclusive *judicial* remedy for reviewing administrative action.' " (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 69–70 [99 Cal.Rptr.2d 316, 5 P.3d 874], fn. omitted.)

The public policies that support the doctrine of res judicata include, "giving certainty to legal proceedings, preventing parties from being unfairly subjected to repetitive litigation, and preserving judicial resources." (*Johnson v. City of Loma Linda, supra*, 24 Cal.4th at p. 77.) Moreover, "[r]efusing to give binding effect to the findings of administrative agencies in quasi-judicial proceedings would . . . undermine the efficacy of such proceedings, rendering them in many cases little more than rehearsals for litigation." (*Id.* at p. 72.)

◼ Ohton steadfastly claims the procedural deficiencies of EO 822 excuse his failure to seek writ review. Ohton relies on *Payne v. Anaheim Memorial Medical Center, Inc.* (2005) 130 Cal.App.4th 729, 741 [30 Cal.Rptr.3d 230] (*Payne*) to support his contention CSU denied him due process protections and the right to actually litigate his claims. We evaluate Ohton's criticisms of EO 822 in light of the standards for due process in the administrative setting. " 'To be adequate, a remedy must afford the individual fair procedur[al] rights. [Citation.] . . . At a minimum, however, fair procedure requires adequate notice of the administrative action proposed or taken by the group or institution and a reasonable opportunity to be heard.' " (*Payne*, at p. 741.)

Ohton's attempts to compare CSU's procedure to that in *Payne* are unavailing. The plaintiff in that case, an African-American medical doctor, complained about wrongdoing at Anaheim Memorial by a radiologist, Dr. Siegel, and other personnel. (*Payne, supra*, 130 Cal.App.4th at pp. 733–734.) The court of appeal concluded that under the applicable regulations, "Payne had only the right to complain about . . . Siegel's comment, and about his general perception that hospital personnel were discriminating against him (and his patients) based upon racial considerations. He did so, both directly and through his attorney. However, once he had done so, the medical staff bylaws guaranteed him nothing more. He had no right to compel anyone to take his assertions seriously, let alone to examine them in the context of a quasi-judicial proceeding." (*Id.* at

p. 739.) On that basis, the court concluded, "But having offered Payne no 'quasi-judicial remedy' to address his grievance, we cannot permit Anaheim Memorial to assert the exhaustion doctrine as a means of depriving him of an *actual* judicial remedy." (*Id.* at p. 743.) EO 822 provided Ohton a meaningful opportunity to fully present his complaint in a quasi-judicial setting that required CSU to investigate his complaint and arrive at a final decision.

In contrast to the absence of remedies in *Payne, supra*, 130 Cal.App.4th at page 743, EO 822 offered Ohton a remedy: CSU was obligated to comprehensively investigate his complaint and arrive at a final decision. In relying upon *Payne* to excuse his failure to seek review by mandate, Ohton confuses the procedures provided by EO 822 with the actual manner in which he claims the investigation was conducted and a final decision made.

■ Ohton "cannot circumvent administrative mandamus review by seeking redress for alleged procedural and due process deficiencies in the dismissal process. That is precisely the purpose of mandamus review—to ferret out such flaws and rectify them." (*Gutkin v. University of Southern California* (2002) 101 Cal.App.4th 967, 978 [125 Cal.Rptr.2d 115].) Ohton's failure to exhaust his judicial remedies had the effect of establishing the propriety of CSU's action. (Accord, *Knickerbocker v. City of Stockton* (1988) 199 Cal.App.3d 235, 243 [244 Cal.Rptr. 764].)

### III. *Retaliation Claims*

With respect to Ohton's claims of retaliation arising after CSU's final decision, we summarily dispose of Ohton's contention he was not required to exhaust his administrative remedies. In his civil complaint for damages, filed on February 13, 2004, he alleged CSU engaged in "continuing retaliation," and he adduced incidents that arose after CSU issued its final decision letter and restored his work schedule in the weight room. Specifically, he alleged that on February 11, 2004, he received an "inaccurate and unjustified performance evaluation." He also alleged that "recently [he] has learned that SDSU is seeking applicants in order to hire another strength and conditioning coach and [he] is informed and believes that SDSU intends to supplant [him] with the new hire on several major Division I athletic teams, including soccer, in an attempt to further limit [his] responsibilities and to further retaliate against him." Section 8547.12, subdivision (a) requires Ohton to file an administrative complaint "within 12 months of the most recent act of reprisal complained about."

■ It is axiomatic that, " '[W]here an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.' [Citation.] The rule 'is not a

matter of judicial discretion, but is a fundamental rule of procedure . . . binding upon all courts.' " (*Campbell v. Regents of University of California, supra,* 35 Cal.4th at p. 321.) Here, the trial court lacked jurisdiction to act on this and any other allegation that Ohton did not raise in a proper complaint of retaliation under the procedures established in section 8547.12, subdivision (c). Failure to exhaust administrative remedy is a jurisdictional defect that may be raised at any time by the parties or the court. (*Hood v. Hacienda La Puente Unified School Dist.* (1998) 65 Cal.App.4th 435, 441 [76 Cal.Rptr.2d 448].)

## IV. *Remand*

This court has the inherent power to remand this matter back to the trial court to give Ohton an opportunity to seek leave to amend to add a petition for writ of mandate. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 238–239 [46 Cal.Rptr.3d 66, 138 P.3d 214] (*Branick*).) We believe it is appropriate under the unusual circumstances of this case to remand. This is the first case arising under section 8547.12, subdivision (c). The term "satisfactorily addressed" has not been previously interpreted and its application has proved troublesome to both parties and the trial court.

Although CSU claims Ohton can only challenge its actions by writ of mandate, it prevailed below by convincing the court to read the words "satisfactorily addressed" out of the statute. Under this approach, the issue is resolved not by writ of mandate, but by consulting a calendar. Ohton's "objective good faith" standard hints at the standards applicable under mandate. Indeed, the final pages of appellant's opening brief read like a memorandum of points and authorities in support of a petition for writ of mandate.

Whether Ohton may amend cannot be determined at this stage of the proceedings because Ohton had not yet filed a motion for leave to amend. On remand, should Ohton "in fact file a motion to amend, the superior court should decide the motion by applying the established rules governing leave to amend [citation] and the relation back of amended complaints." (*Branick, supra,* 39 Cal.4th at p. 239.) To avoid prejudicing the trial court's decisions, we will not attempt to render an advisory opinion on a motion Ohton has not yet filed. (See *Branick,* at p. 243.)

## DISPOSITION

The judgment is reversed and remanded. The trial court shall give Ohton an opportunity to seek leave to amend to add a petition for writ of mandate and decide all issues arising from the same.

McConnell, P. J., and Huffman, J., concurred.

A petition for a rehearing was denied April 10, 2007.