[No. B118282. Second Dist., Div. Seven. Feb. 24, 1999.]

CARSON HARBOR VILLAGE, LTD., Plaintiff and Appellant, v. CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD et al., Defendants and Respondents.

282

COUNSEL

Gilchrist & Rutter, Frank Gooch III, Thomas W. Casparian; Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone and Jonathan J. Panzer for Plaintiff and Appellant.

Glenn R. Watson, City Attorney; Richards, Watson & Gershon and Rochelle Browne for Defendants and Respondents.

OPINION

BOLAND, J.*—

## INTRODUCTION

Carson Harbor Village Mobilehome Park (CHV), owned and operated by Carson Harbor Village, Ltd., is an upscale 420-double-wide-space mobilehome park situated on 70 acres in the City of Carson. CHV is widely regarded as the premiere luxury mobilehome park in Carson. Of the 420 spaces, 407 are subject to Carson rent control laws. Eleven new spaces, completed in 1995, are not subject to rent control laws.

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The Carson Mobilehome Space Rent Control Ordinance (Ordinance) provides for a mobilehome park rental review board (Board) to review property owners' applications for rent adjustments. The Ordinance directs the Board, as a public administrative body, to implement and enforce the provisions of the Ordinance and to hear "all rent increase applications and determine whether to approve or disapprove a rent increase in the manner provided by Section 4704." (Carson Mun. Code, § 4702(e).)

In June 1995, CHV submitted a general rent increase application to the Board for the 407 rent controlled spaces. The application was based on declining profitability calculations. Nineteen months later, in January 1997, the Board granted a monthly rent increase of $58.70, approximately one-third of CHV's original request. CHV sought a writ of administrative mandate to vacate the Board resolution granting CHV the $58.70 monthly general rent increase. As grounds for the writ, CHV alleged the Board abused its discretion by failing to properly interpret Carson rent control regulations concerning rent increase applications. The trial court denied the writ in November 1997. CHV appeals from that decision.

On appeal, we consider two central issues: 1) whether the administrative record reflects substantial evidence to support the Board's January 1997 general rent increase decision; and 2) whether substantial evidence supports the Board's decision not to grant CHV an interim rent increase. As discussed below, we find substantial evidence to support the Board on both issues.

### BACKGROUND AND PROCEDURAL HISTORY

CHV filed an application with the Board for a general rent increase on June 29, 1995. The application proposed a general rent increase range between $163.42 and $178.07 for each of the 407 rent-controlled spaces. CHV's application was based in part on a significant increase in operating expenses since the last rent increase in December 1994. The increase in operating expenses was primarily related to costly remediation of contaminated wetlands located on CHV's property. Absent a monthly rent increase in the $163.42 to $178.07 range, CHV asserted it would not be able to restore its profitability to 1992 levels, the last earnings year the Board considered in its 1994 rent increase decision.

The Board's professional staff (Staff) reviewed the application and supporting documents. In accord with statutory requirements, notice was sent to all affected park residents on August 28, 1996, informing them of the availability of the application for review and soliciting their input on the proposed rent increase.

The rent increase application was originally scheduled for public hearing on October 9, 1996, but the hearing was continued until December 11, 1996, at the request of CHV, the mobilehome park residents, and the homeowners association. The continuance was requested because the residents were experiencing difficulty in preparing responses, major issues remained unresolved, and the residents' attorney was engaged in trial.

Public notices for the December 11, 1996, hearing were posted and sent on November 27, 1996. On December 6, 1996, Staff issued a report (First Staff Report) to interested parties recommending a monthly rent increase of $99.37 for each of the 407 rent-controlled spaces in the park. The same report was made available to the general public on December 9, 1996.

A few hours before the December 11, 1996, public hearing, Staff issued another report (Second Staff Report) decreasing the recommended per space rent increase from $99.37 to $76.91. The decrease resulted primarily from reducing the attorneys' fees operating expense line item from $208,765 to $108,702.

At the December 11, 1996, hearing, the mobilehome park homeowners association sought a further continuance to study and respond to the new information and issues presented in the Second Staff Report. Despite its own inability to respond to changes in the Second Staff Report, CHV requested that the Board proceed with the rent increase application without ruling on the attorneys' fees issue. Despite CHV's objection to a further continuance, the Board rescheduled the hearing for January 22, 1997. At the conclusion of the December 11, 1996, hearing, CHV requested an interim rent increase as provided by the rent control ordinance. The request was denied.

On January 2, 1997, CHV submitted additional documentation disputing the downward adjustment of $100,063 in attorneys' fees. On January 16, 1997, staff issued a final report (Third Staff Report), which recommended a monthly rent increase of $58.70 on each of the 407 rent-controlled spaces.

At the January 22, 1997, public hearing, the Board adopted Resolution No. 97-185, granting CHV a profit maintenance monthly rent increase of $58.70 per space on the 407 affected spaces. On April 22, 1997, CHV filed a petition for a writ of administrative mandate (Petition) with the Los Angeles Superior Court. Hearings were held on September 4, 1997, and October 6, 1997, before Judge David P. Yaffee. The trial court denied CHV's petition on November 6, 1997. It found the Board did not abuse its discretion in disallowing, as operating expenses, a portion of the costs incurred in remediating the contaminated wetlands and the cost of constructing 11 new spaces in the park. The trial court further found CHV failed to

establish that the monthly rent increase of $58.70 resulted in an unfair return on its investment. It finally found CHV was not entitled to an interim rent increase because the time period between CHV's submission of materials on January 2, 1997, and the Board's decision on January 22, 1997, was well within the statutory time limit.

On December 19, 1997, CHV filed an appeal seeking a writ to compel the Board to grant the monthly rent increase of $99.37 per space recommended in the First Staff Report. CHV also seeks compensation for the Board's failure to grant an interim rent increase for the period between December 11, 1997, to January 22, 1998.

## STANDARD OF REVIEW

An aggrieved party may seek judicial review by a trial court of a local mobilehome rent control board's final decision by seeking a writ of mandate. (Code Civ. Proc., § 1094.5; *Searle* v. *City of Berkeley Rent Stabilization Bd.* (1988) 197 Cal.App.3d 1251 [243 Cal.Rptr. 449].) Where the board decision does not involve a fundamentally vested right, an appellate court must review the administrative record and apply the substantial evidence test. (*301 Ocean Ave. Corp.* v. *Santa Monica Rent Control Bd.* (1991) 228 Cal.App.3d 1548, 1556 [279 Cal.Rptr. 636]; *Westwinds Mobile Home Park* v. *Mobilehome Park Rental Review Bd.* (1994) 30 Cal.App.4th 84, 90-91 [35 Cal.Rptr.2d 315].)

The substantial evidence test requires the court to begin with the presumption that the record contains evidence to sustain the board's findings of fact. (*Pescosolido* v. *Smith* (1983) 142 Cal.App.3d 964, 970 [191 Cal.Rptr. 415].) The board's interpretation of an ordinance's implementation guidelines is given considerable deference and must be upheld absent evidence the interpretation lacks a reasonable foundation. (*City of Berkeley* v. *City of Berkeley Rent Stabilization Bd.* (1994) 27 Cal.App.4th 951, 962 [33 Cal.Rptr.2d 317].) The burden is on the appellant to prove the board's decision is neither reasonable nor lawful. (*301 Ocean Ave. Corp.* v. *Santa Monica Rent Control Bd.* (1985) 175 Cal.App.3d 149, 154 [221 Cal.Rptr. 610].)

In reviewing the decision of the board, an appellate court must consider whether substantial evidence indicates the rental rates provided a "fair rate of return on the cost of that applicant's equity investment." (*Yee* v. *Mobilehome Park Rental Review Bd.* (1993) 17 Cal.App.4th 1097, 1106 [23 Cal.Rptr.2d 1].) In light of this standard, we review the facts of this case.

## DISCUSSION

The first issue for consideration is whether the Board denied CHV a constitutionally guaranteed rate of return by refusing to grant a monthly

rent increase higher than $58.70. CHV does not challenge the validity of the Carson rent control scheme. Rather, it contends the Board misapplied and misinterpreted the Ordinance and its guidelines.

CHV asserts the Board abused its discretion by adopting the recommendations of the Third Staff Report. According to CHV, the report discounted attorneys' fees and misallocated remediation costs as operating expenses, thereby producing an unreasonably low general rent increase.

Besides the principal rate of return issue, we must consider whether the Board correctly characterized and applied the costs of adding eleven new spaces and whether the Board improperly denied CHV an interim rent increase.

I. *A Just, Fair and Reasonable Return Is the Overarching Standard Applicable to All Rent Control Schemes*

Constitutionally valid rent control ordinances must be reasonably calculated to eliminate excessive rents and provide landlords a just, fair and reasonable return on their property. (*Donohue* v. *Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168, 1177 [55 Cal.Rptr.2d 282]; *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001].) CHV asserts that under the Carson Mobilehome Space Rent Control Ordinance Implementation Guidelines (Implementation Guidelines), the fair return standard does not apply. Specifically, CHV argues the Board should consider the issue of fair return only if an applicant claims that a rent increase, determined by applying the ordinance's 11 factors, will not produce a fair return. (Implementation Guidelines, § IV(A).)

We disagree. Fair return is the constitutional measuring stick by which every rent control board decision is evaluated. Consistent with decisional authority, the Ordinance requires the Board to approve just, fair and reasonable rent increases. (Carson Mun. Code, § 4704(g); Implementation Guidelines, § I(B).) The Ordinance directs the Board to review all relevant factors in making a rent increase application determination. However, no one factor is determinative so long as the Board's decision permits a just, fair and reasonable return on the property. (Implementation Guidelines, § I(D).)

A "just, fair and reasonable" return is characterized as sufficiently high to encourage and reward efficient management, discourage the flight of capital, maintain adequate services, and enable operators to maintain and

support their credit status. However, the amount of return should not defeat the purpose of rent control to prevent excessive rents. (*Oceanside Mobilehome Park Owners' Assn.* v. *City of Oceanside* (1984) 157 Cal.App.3d 887, 907 [204 Cal.Rptr. 239].) Despite this characterization, courts continue to struggle with the meaning of the "just, fair and reasonable return" standard. "There is a range of rents which can be charged, all of which could be characterized as allowing a 'just and reasonable' return. [Citation.]" (*San Marcos Mobilehome Park Owners' Assn.* v. *City of San Marcos* (1987) 192 Cal.App.3d 1492, 1502 [238 Cal.Rptr. 290].) At least one court has deemed the term "fair return" incapable of precise definition. (*City of Berkeley* v. *City of Berkeley Rent Stabilization Bd.*, *supra*, 27 Cal.App.4th at p. 984.)

## II. *Carson's Formula for Setting Rent Control Rates Is Consistent With Constitutional Requirements and the Weight of Authority*

Under broad constitutional tolerance, California cities may enact various forms of residential rent control measures to satisfy the just, fair and reasonable rent standard. *(Tri County Apartment Assn.* v. *City of Mountain View* (1987) 196 Cal.App.3d 1283, 1286 [242 Cal.Rptr. 438].) Public administrative bodies, charged with implementing and enforcing rent control measures, are not obliged by either state or federal constitutional requirements to employ any prescribed formula or method to fix rents.

 The Ordinance offers little assistance in clarifying the definition of a "just, fair and reasonable" return. The Ordinance also does not specify the evidence that a mobilehome park owner must provide to the Board to justify a rent increase. Instead, the Ordinance enumerates 11 nonexclusive factors which the Board is required to consider, "in addition to any other factors it considered relevant," in determining a landlord's just, fair and reasonable return. (Carson Mun. Code, § 4704(g).)[1]

In addition to the Ordinance, the Carson City Council adopted Implementation Guidelines in 1994. The Implementation Guidelines are broad policy

---

[1]The 11 factors specified in Carson Municipal Code section 4704(g) for consideration in determining whether a rent increase is "just, fair and reasonable" are as follows:

"(1) Changes in the Consumer Price Index for All Urban Consumers in the Los Angeles - Long Beach - Anaheim Metropolitan Area published by the Bureau of Labor Statistics.

"(2) The rent lawfully charged for comparable mobilehome spaces in the City of Carson.

"(3) The length of time since either the last hearing and final determination by the Board on a rent increase application or the last rent increase if no previous rent increase application has been made.

"(4) The completion of any capital improvements or rehabilitation work related to the mobilehome space or spaces specified in the rent increase application, and the cost thereof, including such items of cost, including materials, labor, construction interest, permit fees and other items the Board deems appropriate.

"(5) Changes in property taxes or other taxes related to the subject mobilehome park.

statements for effectuating the ordinances, and are intended to be followed by the Board in acting upon mobilehome park general rent increase applications. CHV asserts the Board abused its discretion by misinterpreting the Ordinance and the Implementation Guidelines.

■ We interpret ordinances by the same rules applicable to statutes. (*County of Madera* v. *Superior Court* (1974) 39 Cal.App.3d 665, 668 [114 Cal.Rptr. 283].) Statutory interpretation is ultimately a judicial function. ■ "Nevertheless, 'the contemporaneous construction of a statute by an administrative agency charged with its administration and interpretation, while not necessarily controlling, is entitled to great weight and should be respected by the courts unless it is clearly erroneous or unauthorized . . . . [Citations.]' " (*Anderson* v. *San Francisco Rent Stabilization & Arbitration Bd.* (1987) 192 Cal.App.3d 1336, 1343 [237 Cal.Rptr. 894].)

■ Mobilehome rent control ordinances are accorded particular deference as rational curative measures to counteract the effects of mobilehome space shortages that produce systematically low vacancy rates and rapidly rising rents. (*Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 189, fn. 4 [197 Cal.Rptr. 284, 672 P.2d 1297].) The selection of an administrative rent ceiling standard "is a task for local governments . . . and not the courts." (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 681 [209 Cal.Rptr. 682, 693 P.2d 261].) Further, the actual method utilized to regulate rents is immaterial so long as the result achieved is constitutionally acceptable. (*Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 370-372 [228 Cal.Rptr. 726, 721 P.2d 1111].)

■ The Board's interpretation of Carson's rent control laws merits great weight. We must therefore defer to the Board's interpretation and application of the Ordinance and Implementation Guidelines unless we find its construction lacks substantial evidence to support its findings. The primary issue CHV raises on appeal relates to the Board's interpretation of the Ordinance and Implementation Guidelines regarding the calculation of operating expenses in evaluating CHV's need for a monthly rent increase.

---

"(6) Changes in the rent paid by the applicant for the lease of the land on which the subject mobilehome park is located.

"(7) Changes in the utility charges for the subject mobilehome park paid by the applicant and the extent, if any, of reimbursement from the tenants.

"(8) Changes in reasonable operating and maintenance expenses.

"(9) The need for repairs caused by circumstances other than ordinary wear and tear.

"(10) The amount and quality of services provided by the applicant to the affected tenant.

"(11) Any existing written lease lawfully entered into between the applicant and the affected tenant."

### III. *The Board's Calculation of the Mobilehome Park's 1995 Operating Expenses Is Supported by Substantial Evidence*

CHV argues the Board misinterpreted the Ordinance and abused its discretion by disallowing attorneys' fees and misallocating other operating expenses related to the wetlands remediation project. For the following reasons, we find substantial evidence supports the conclusion that the Board's action in calculating CHV's 1995 operating expenses and the monthly rent increase were consistent with the spirit and purpose of the Ordinance and Implementation Guidelines. We therefore conclude the Board did not abuse its discretion. (Code Civ. Proc., § 1094.5, subd. (b).)

The Ordinance utilizes a gross profit maintenance approach to arrive at a "just, fair and reasonable" return. The gross profit maintenance approach protects profitability by increasing rent levels to cover rising expenses and inflation. Thus, the rent increase determination is influenced by the amount of a mobilehome park's operating expenses for the year under review.

Between 1992 and 1995, increases in water expenses, property taxes, street maintenance, wetlands remediation and related legal expenses caused CHV's annual operating expenses to increase 26.8 percent to $360,269. During the same period, gross income increased by $130,636 or 6.57 percent. This growth primarily resulted from rent control increases between 1992 and 1995. In the same three-year period, CHV's annual gross profit, calculated by subtracting the year's operating expenses from the mobilehome park's gross income, declined by $229,633 or 35.58 percent. To offset these declining profitability figures, CHV submitted a general rent increase application to the Board in 1995.

In its application, CHV used the 1992 profit level as the gross profit maintenance target for the Board's consideration in setting the new monthly rental rates. According to CHV, the 1992 profitability level could only be realized by adopting the First Staff Report's recommended monthly rent increase of $99.37 per space. The Board, however, adopted a monthly rent increase of $58.70 per space as recommended in the Third Staff Report. The primary difference between the First and Third Staff Reports' recommendations involved the distribution of loan proceeds over a three-year rather than a one-year period and the deduction of attorneys' fees as operating expenses in connection with the wetlands remediation project. We deal with each item in turn.

A. *Substantial evidence supports the Board's allocation of wetlands remediation expenses over a three-year period.*

In 1995, CHV incurred expenses of $190,333 to remediate wetlands contamination on mobilehome park property. It used proceeds from a $300,000 third trust deed loan to pay the cost of the project, and submitted the entire $190,333 cost as a 1995 operating expense.

Instead of applying the amount as a 1995 operating expense, the Board allocated the $190,333 cost over a three-year period on the basis that the loan, which was the source of project funds, was payable over a twenty-eight-month period. Although the Board allowed interest payable on the loan in 1995 as an operating expense in that year, it allocated $101,401 of the $190,333 cost as a 1995 operating expense, $66,708 as an operating expense for 1996, and $22,224 as a 1997 operating expense. The three-year allocation of the wetlands remediation project cost decreased the monthly rental increase from $76.91 to $58.70 per space.

CHV contends the Board erred by not allowing $88,932 of the $190,333 cost as a 1995 operating expense. It argues the three-year allocation of the wetlands remediation cost was abuse of discretion because an expenditure incurred in a given year is properly allowed as an expense for the same year.

While CHV's argument appears logical on its face, expensing the entire cost of the wetlands remediation project in 1995 would overstate CHV's operating expenses for that year. While the project cost was incurred in 1995, the cost was paid from proceeds of a loan repayable over a 28-month period. Allocating the cost, paid out of loan proceeds, to a single year, would understate the 1995 gross profit figure and artificially inflate CHV's need for a monthly rental increase. A permanent, artificially high monthly rent increase would permit CHV to realize unwarranted profits from increased revenues long after repayment of the loan obligation incurred to remediate the wetlands contamination. Such a result would be inconsistent with the overarching goal of protecting residents through rent control laws.

CHV further argues the three-year allocation of wetlands-related expenses was an abuse of discretion because a cost incurred in a given year should be allocated as an expense in the same year. The Ordinance, CHV asserts, does not empower the Board to deviate from this approach by creating new expense categories.

While the Ordinance does not address the Board's authority to distinguish between extraordinary nonrecurring expenses and normal operating expenses, it is within the Board's authority to make such a distinction if it relates to the impact of a rent increase on mobilehome park residents. The California Supreme Court recently employed a similar results oriented analysis in *Kavanau* v. *Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761 [66 Cal.Rptr.2d 672, 941 P.2d 851]. *Kavanau* focused on a challenge to the constitutional viability of a rent control scheme. "Though due process protections generally focus on method, not result, in the context of price regulation 'it is the result reached not the method employed which is controlling. [Citations.]' " (*Id.* at p. 772; see also *Fisher* v. *City of Berkeley, supra,* 37 Cal.3d 644; *Carson Mobilehome Park Owners' Assn.* v. *City of Carson, supra,* 35 Cal.3d 184; *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129.)

Although the Ordinance and Implementation Guidelines do not specifically provide for allocation of operating expenses over an extended period of time, the Carson rent control scheme, the Implementation Guidelines and the Board's role in implementing and enforcing the ordinance are sufficiently flexible to permit such an allocation. Substantial evidence therefore supports the Board's conclusion that the cost of the wetlands remediation project is not a normal expense, and that the project cost should be allocated over the three-year loan repayment period.

B. *The Board properly disallowed attorneys' fees in connection with wetlands remediation litigation as an operating expense.*

CHV next contends the Board abused its discretion by eliminating $100,063 in legal fees expenses related to wetlands contamination litigation. The elimination was a significant factor in reducing the monthly rent increase from $99.37 recommended in the First Staff Report to $76.91 recommended in the Second Staff Report.

Section II(A)(2)(i) of the Implementation Guidelines states: "Reasonable attorneys' fees incurred in connection with park operation and presenting rent increase applications to the Board are allowable operating expenses. Attorneys' fees incurred in connection with challenging the Ordinance or actions of the board in court are not allowable operating expenses."

In formulating its decision, the Board examined each attorneys' fees expense and allocated only certain categories of fees as operating expenses.

The Board did not allow attorneys' fees incurred for the investigation, research and preparation of a lawsuit to recover the costs of the wetlands remediation from Unocal, Caltrans, the Cities of Carson and Compton, and others. Additionally, the Board disallowed attorneys' fees incurred in attempting to recover cleanup costs from insurers, despite apparent environmental damage policy exclusions. The Board found the legal services underlying those attorneys' fees were not provided in connection with regular mobilehome park operations. The Board did, however, allocate some attorneys' fees related to the wetlands remediation as a 1995 operating expense. Those included fees incurred in determining compliance with regulations governing wetlands remediation and obtaining remediation plan approval from the Regional Water Quality Control Board.

■ "The state and federal Constitutions require only a fair process that reasonably takes into consideration the landlord's interests, and a landlord's return need only fall within a 'broad zone of reasonableness.' [Citation.]" (*Kavanau* v. *Santa Monica Rent Control Bd.*, *supra*, 16 Cal.4th at p. 784.) ■ The administrative record, including the January 22 1997, public hearing transcript, clearly reflects that the Board deliberated on the attorneys' fees issue and carefully weighed arguments from Staff and CHV. At the hearing, the Board received testimony from CHV, mobilehome park residents and Staff. Each side was afforded an opportunity for rebuttal. The Board then questioned interested parties and deliberated on the attorneys' fees issues. The Board acknowledged previously allowing attorneys' fees as operating expenses for initiating unlawful detainer actions, answering quiet title complaints, and responding to lawsuits by park residents. The Board, however, did not regard suits against other parties to recover legal expenses associated with the wetlands remediation project as directly related to regular park operations.

We find substantial evidence in the administrative record supports the Board's findings. A court should not substitute its judgment for that of the local mobilehome rent control board even though the court may arrive at different findings of fact after hearing the case on its merits. (*City of San Diego* v. *California Coastal Com.* (1981) 119 Cal.App.3d 228 [174 Cal.Rptr. 5].) We are therefore unwilling to overturn the Board's decision based on its careful weighing of evidence and interpretation of expenses directly connected with park operations.

C. *The Board's decision to include the income from the 11 newly constructed spaces in calculating CHV's profit picture should not be disturbed.*

CHV started construction on 11 new mobilehome park spaces in 1994. A portion of the $300,000 trust deed loan was used to finance the construction. The new spaces, which are not subject to Carson rent control laws, were completed and began generating revenue in 1995. (Civ. Code, §§ 798.7, 798.45.)

CHV contends it will never realize a return on its investment in the 11 newly constructed mobilehome spaces for the following reasons: 1) the Board erroneously included increased income and operating expenses generated from rental of the spaces in calculating CHV's 1995 gross profit maintenance figure; and 2) the Board refused to allow CHV to seek a separate capital improvement rent increase with respect to the construction of the new spaces.

The Board allowed, as a 1995 operating expense, the interest on the portion of the $300,000 loan used to finance the new space construction. It did not allow the construction costs as an operating expense. It viewed new space construction as an investment in the mobilehome park's infrastructure, similar to the manner down payments and principal mortgage payments made on mobilehome park acquisitions are regarded as investments. The Board's approach is consistent with the Implementation Guidelines which allow interest on acquisition loans as an operating expense, but do not allow principal payments on the loans as an operating expense. (Implementation Guidelines, § II(A)(2), subds. (e)-(h).)

The Board further argues that the newly constructed spaces are not a capital improvement as contemplated by the capital improvement rent increase application guidelines. A capital improvement is defined as "the installation of new improvements and facilities and/or the replacement or reconstruction of existing improvements and facilities which consist of more than ordinary maintenance and/or repairs." (Carson Mun. Code, § 4701(c).) We agree with the Board's characterization of the newly constructed spaces under the Implementation Guidelines. CHV's construction of the new spaces was an expansion of a valuable revenue source, not a capital improvement. The spaces do not contribute to the overall use and enjoyment of the mobilehome park by its residents, and in fact reduce the number of available parking spaces for residential vehicles. CHV therefore is not entitled to

include construction costs on the 11 new spaces as a capital improvement expense.

Substantial evidence supports the Board's determination regarding 1995 operating expenses as part of CHV's general rent increase application. As reflected in its comprehensive reports, Staff reviewed relevant documentation and formulated numerous viable options and recommendations. The parties, including affected mobilehome park residents, were afforded ample opportunity to review the staff reports, submit additional written information, and present testimony to the Board. The administrative record clearly reflects that the Board considered all relevant factors, as directed by rent control laws, in making its final determination. The Board's decision granting a monthly rent increase of $58.70 per space is therefore supported by substantial evidence.

IV. *Substantial Evidence Supports the Board's Decision to Reject CHV's Request for an Interim Rent Increase*

■ Once a general rent increase application is deemed complete, the Board is required to hold a hearing on the application within 60 days. (Carson Mun. Code, § 4704(e).) The Board is permitted 15 days after the hearing to make a final rent increase decision for the affected mobilehome spaces. (Carson Mun. Code, § 4704(f).) If the Board is unable to render a decision within the aggregate 75-day window, the Board may approve an interim rent increase for the affected spaces if warranted by the 11 factors previously discussed, the facts set forth in the application, the documentation submitted to the Board, and other information known to the Board. (Carson Mun. Code, § 4704(j).) If an interim rent increase is approved, the application hearing or the Board's final determination may only be extended for a maximum of two 60-day periods. (Carson Mun. Code, § 4704(k).)

CHV contends the Board abused its discretion by failing to grant an interim rent increase under Carson Municipal Code section 4704(j) when a continuance of the December 11, 1996, hearing was granted. CHV argues once the hearing was continued, the Board's decision fell outside the 75-day window. CHV also argues the continuance was attributable to Board and staff delay. Conversely, the Board claims the delay was caused by CHV's failure to timely submit material information.

The administrative record supports the Board's position that the continuance was attributable to neither its action nor staff delay. On November 27,

1996, and again on December 2, 1996, CHV submitted additional attorneys' fees information to staff. Although Staff was afforded little time to adequately digest the new information, it issued the First Staff Report on December 5, 1996. After reviewing the new information in greater detail, Staff revised its recommendations and issued a Second Staff Report hours before the hearing on December 11, 1996. The Second Staff Report disputed $105,000 in attorneys' fees based on a declaration from the Carson City Attorney's Office.

At the hearing, CHV requested that the Board move forward on all aspects of the application, except for the attorneys' fees issue. At the same time, CHV sought a continuance of the hearing on the attorneys' fees issue because it had not been afforded an opportunity to respond to the declaration which it found misleading. Further, CHV argued that proceeding on the attorneys' fees issue without allowing time to respond violated due process. Finally, CHV suggested a continuance solely on the attorneys' fees issue to allow staff to review CHV's response and reformulate its report.

Staff argued CHV was responsible for the continuance because of its refusals to submit information and its delays in responding to repeated Staff requests for attorneys' fees information during the several month period leading up to the December 11, 1996, hearing. Letters included in the administrative record dated May 17, 1996, June 20, 1996, June 25, 1996, September 27, 1996, and October 1, 1996, support this argument. CHV contended the information submitted to Staff on November 27, 1996, and December 2, 1996, was not new information, but was instead detailed responses to Staff requests questioning the propriety of legal expenses incurred in connection with the remediation project. However, the Second Staff Report contained 42 pages of new material submitted by CHV, including legal services invoices submitted 9 days before the December 11, 1996, hearing. The Second Staff Report also contained the staff's analysis of the new CHV documents.

The Board rejected the request for an interim rent increase because it did not want to consider CHV's general rent increase application in a piecemeal fashion and had not been afforded ample opportunity to review the complex recommendations contained in the Second Staff Report. Moreover, the statute authorizing an interim rent increase applies only if the delay is caused by the Board or Staff. Based on the record, we conclude substantial evidence supports the Board's denial of an interim rent increase.

## CONCLUSION

The Board's decision granting a monthly rent increase of $58.70 per space represents a careful balancing and reasonable resolution of the competing interests involved in rent control matters. Substantial evidence indicates the increase provides CHV a just, fair and reasonable return, while minimizing the impact of excessive rental rates on CHV's residents. The writ was therefore properly denied. (Code Civ. Proc., § 1094.5.)

## DISPOSITION

The judgment of the trial court denying the writ of administrative mandate is affirmed. Respondents are awarded costs on appeal.

Woods, Acting P. J., and Neal, J., concurred.

A petition for a rehearing was denied March 29, 1999, and appellant's petition for review by the Supreme Court was denied May 19, 1999. Baxter, J., did not participate therein.