180 Cal.App.4th 1402 (2010)
103 Cal. Rptr. 3d 665
DAVID OHTON, Plaintiff and Appellant,
v.
BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY et al., Defendants and Respondents.
No. D053738.
Court of Appeals of California, Fourth District, Division One.
January 12, 2010.
*1405 Schoville & Arnell, Dennis A. Schoville, Louis G. Arnell, James S. Iagmin; Boudreau Williams and Jon R. Williams for Plaintiff and Appellant.
Gordon & Rees, Christopher B. Cato, Eric M. Volkert and James J. McMullen, Jr., for Defendants and Respondents.

OPINION
O'ROURKE, J.
This case is before us a second time. In Ohton v. Board of Trustees of California State University (2007) 148 Cal.App.4th 749, 769 [56 Cal.Rptr.3d 111] (Ohton I), David Ohton, a strength and conditioning coach at San Diego State University (SDSU), filed an internal complaint alleging retaliation, which the board of trustees of California State University (CSU) timely investigated. Thereafter, he filed an action for damages in superior court against CSU and certain individuals. CSU successfully moved for summary judgment. We reversed, but held that before proceeding with a civil action for damages Ohton was required to first file a petition for a writ of mandate in the trial court for a determination of whether CSU had "satisfactorily addressed" his complaint within the meaning of Government Code section 8547.12, subdivision (c).[1] (Ohton I, supra, at p. 769.) We remanded *1406 the case for Ohton to seek leave to amend his complaint to add a petition for writ of mandate in the superior court. (Ohton I, supra, at p. 771.) Neither Ohton nor CSU appealed Ohton I.
On remand, Ohton's amended complaint alleged retaliation, and included a petition for writ of mandate, contending that CSU's investigation did not comply with section 8547.12, and its findings were arbitrary and capricious and not supported by the evidence. Specifically, he alleged CSU erred in concluding he had not made certain protected disclosures in good faith; it applied an unduly restricted definition of "retaliation"; CSU did not apply the statutorily mandated "clear and convincing standard" in evaluating CSU's justifications for its adverse employment actions; CSU did not comply with the statute's requirements regarding punishment; and CSU's investigation denied him due process of law by denying him meaningful notice and an opportunity to be heard, an opportunity to confront evidence against him and develop and present evidence and testimony of his own, and a neutral fact finder. Ohton sought leave to file a civil action for damages. The trial court denied his writ petition.
Ohton contends we should abandon Ohton I and our conclusion that he was required to obtain a writ of mandate before proceeding with a civil action for damages. Alternatively, he contends (1) the trial court erred by not admitting his extra-record evidence; (2) CSU's investigation denied him due process of law; and (3) CSU's investigation and findings were contrary to law and arbitrary and capricious.
We conclude, based upon the administrative record before the trial court, CSU did not satisfactorily address Ohton's complaint because it applied an incorrect standard in evaluating whether Ohton's retaliation claims were made in good faith, and also failed to address the matter of discipline and punishment despite having found retaliation. Accordingly, we reverse the judgment.

*1407 FACTUAL AND PROCEDURAL BACKGROUND

Ohton's Protected Disclosure
In or around February 2003, Ohton responded to an SDSU athletic department audit by submitting a 103-page document (the Ohton Report) asserting National Collegiate Athletic Association (NCAA) violations and other athletic department irregularities. He wrote: "I did not travel at all this past year [the 2002-2003 season] and I heard the stories about how [head football] Coach Tom Craft got seriously drunk the night before the Idaho game (in Idaho) and he had to be assisted by several of his assistants back to the hotel. A few boosters informed me that it was a despicable sight to see a drunken Craft being helped through the lobby. The next day, Idaho beat us 48-36, and we were heavily favored to win. Several weeks later, against [sic] some of our football coaches were seen walking out of a stripper club at 1:00 a.m. We lost that game 15-8 and again, we were favored. It begs the question, if I know about these drinking episodes and I'm in San Diego, don't you think our football administrators knows [sic]?" The auditor's report was issued in April 2003.

Ohton's Retaliation Complaint
In August 2003, Ohton filed an internal administrative complaint under CSU's Executive Order No. 822 (EO 822).[2] He claimed that Tom Craft and other members of the athletic department retaliated against him in violation *1408 of the California Whistleblower Protection Act (CWPA) (§ 8547 et seq.) because he reported to a university auditor information critical of various athletic department personnel and practices.
Ohton further claimed that by the second week of June 2003 the athletic department personnel managed to identify him as someone who cooperated with the audit, and Craft obtained a copy of Ohton's confidential report and circulated it to the athletic department members; consequently, individual defendants retaliated against Ohton in differing ways. Specifically, in the last week of June 2003, Craft met with the football team and asked the members about their opinions of Ohton's performance as strength coach because according to Craft Ohton had "turned in" their program to the NCAA, and "was out to get them."
Ohton claimed that on July 31, 2003, the interim athletic director, Gene Bartow, informed him that Craft wanted his own strength and conditioning coach and that the department would hire a new coach who would report only to football. Bartow tried to convince him to go along with this idea, but Ohton replied this was clear retaliation arising from revelations contained in the Ohton Report.
Ohton finally claimed that on August 6, 2003, Bartow and Dave Powroznik met with him, and Bartow explained that "Football was a family and that [he] was no longer a part of that family." Bartow told Ohton that effective immediately Ohton was relieved of all field responsibilities for football, and they did not want him to stretch the team or be on the field for any responsibilities. On August 20, 2003, Bartow instructed Ohton his new work hours were from 6:00 a.m. to 2:00 p.m.

CSU's Investigation
CSU retained Attorney John Adler to investigate Ohton's complaints. Adler concluded in his report that Ohton was not removed as strength coach from the football program because he reported NCAA rule violations. Adler stated: "Some of the personal and program-related allegations and accusations set forth by Mr. Ohton in [the Ohton Report] were a factor in Ohton being removed as the strength and conditioning coach for football. However, the allegations and accusations concerning equipment room improprieties, the specific focus of Mr. Redmond's audit and report, were not a factor and were irrelevant to the removal decision."
Adler found as follows regarding Ohton's work hours reduction: "On July 7, 2003, [Bartow] began his three month interim term of service to the *1409 University. Craft and Powroznik immediately presented Bartow with their concerns about Ohton continuing to serve as the strength and conditioning coach for football .... Craft told Bartow he had taken a year to evaluate certain people and that he now wanted a `different look' in strength and conditioning for the team, with a focus on speed and quickness.... [¶] At or about this time, Bartow already knew Ohton had made allegations about the football program, but Bartow felt Craft's request was for the purpose of trying to win football games.... Bartow actually sought to end the appointment of Ohton, a request that was promptly rejected by [CSU]. [¶] ... [¶] ... Bartow involuntarily removed Ohton from any involvement with football and advised him that his work hours were now set at 6:00 a.m. to 2:00 p.m. Monday through Friday. Bartow directed Ohton to be out of the weight room and off campus by 2:00 p.m. each day.... Bartow provided the University with a memo dated August 7, 2003, requesting this change, at this time, because `the relationship between Coach Craft and Coach Ohton seems to be strained beyond a tolerable level.'"
Adler determined this work hours restriction "was a re-assignment and job modification taken against Mr. Ohton due to his refusal to voluntarily relinquish football responsibilities and due to the perceived antagonism of Mr. Ohton towards the current football program, as illustrated by some of the allegations and accusations in the Ohton Report." Adler nevertheless pointed out, "The time restriction on Ohton had the effect of adversely impacting the ability of Ohton to work with sixteen athletic teams, other than football, and served as a punitive, message-packed restriction: don't mess with football. This unnecessary, demeaning act was in response to Ohton's rejecting Bartow's request that he voluntarily relinquish football responsibilities and in response to Craft and Powroznik's desire to keep Ohton far away from the football student-athletes to prevent Ohton from obtaining information and prevent Ohton from undermining the coaches.... By all accounts, even if Ohton remained in the weight room and on campus until 5:00 p.m. each day, he would not encounter the football student-athletes, who are on the field until 5:15 p.m. or later each practice day."
Adler concluded with respect to Ohton's claim about Craft's public drunkenness: "[I]t is arguably a claim of gross misconduct or incompetence. The issue as raised by Mr. Ohton, however, was hearsay and fully refuted. The accusation appears in two sentences on the 98th page of the 103-page, single-spaced document in a section devoted to problems with football travel. This accusation was not intended to `blow the whistle' on the specific conduct. The accusation was inserted as support for the general contention that athletic department travel was not being properly controlled and, thus, it is arguably a contention of economic waste or inefficiency.... The specific personal allegation against Craft is not a `protected disclosure.'"
*1410 CSU's vice chancellor, Jackie McClain, forwarded Adler's report to Ohton for his response, which Ohton submitted. Adler replied, "Regardless of [Ohton's] subjective intent, the statute requires a finding of `good faith' disclosure. The comments that contributed to Ohton's reassignment and hour restrictions were not good faith disclosures; rather, they were personal attacks based on faulty or incomplete information, improper assumptions, or innuendo, and/or were accusations that did not involve improper governmental activities. [¶] It is my opinion that Ohton's accusation that Head Coach Tom Craft was intoxicated in public was a factor in the timing of and the decision to remove Ohton as the strength and conditioning coach, and that such accusation was not made in good faith." Adler also stated, "Sally Roush personally investigated this extremely serious, career-threatening accusation. Ohton told Roush that in actuality one booster told him that he had heard it from two others. The `two others' denied it occurred; Ohton's `source' did not confirm the story either. Craft and others totally denied it occurred. Ohton's relating this very serious accusation appears driven by disrespect for Craft. Ohton's false assertions of purported fact appear not in `good faith.'"

CSU's Final Determination Letter
McClain sent Ohton a final "letter of determination" resolving his complaint. She stated she generally treated the Ohton Report as a protected disclosure: "I note you submitted your table of contents to [the auditor] prior to submitting your statement, and that he pursued various issues through follow-up questions .... I also note you asked for and received assurances from [the auditor] that you could not be retaliated against for your participation in the audit. Based on these facts, including some information possibly unknown to Mr. Adler, I disagree with Mr. Adler's conclusion that your written audit statement as a whole is not a `protected disclosure.'"
Nevertheless, McClain concluded the particular disclosure relating to Coach Craft was not protected disclosure: "Vice President Sally Roush, justifiably, concerned about potential misconduct, personally examined this allegation [regarding the Idaho game] and concluded it was inaccurate and false. According to [Roush] you admitted only one booster brought this alleged incident to your attention, not the `few' specifically mentioned in your written statement. When [Roush] contacted this booster, he denied having `seen' this alleged incident and referred [Roush] to other individuals, who also denied witnessing any such incident. [Roush] nevertheless interviewed SDSU employees who traveled with the football team to ask whether they had any information about the coach drinking before games. [Roush] concluded this incident did not happen. Based on the information provided by Mr. Adler and a separate interview of [Roush] by Maria Santos, Senior Director of Employee Relations, I am confident that [Roush's] inquiry and *1411 her conclusion were reasonable. [¶] I can think of no legitimate reason for you to distort the truth in this manner, particularly with respect to an inflammatory accusation that could ruin a coach's career. It lends credence to Mr. Adler's conclusion that you were pursuing a personal and vindictive agenda against Coach Craft. I therefore conclude this statement was not made in good faith and is therefore not a `protected disclosure.'"
McClain stated Ohton was removed from the football program for independent nonretaliatory reasons: "Mr. Adler concluded the decisions to remove you as strength and conditioning coach for the football team and restricting your hours on campus and in the weight room were based, at least in part, on specific comments contained in your written audit statement. Specifically, your factually false comments about the coach's intoxication at an away game were central to the University's decision to take the action it did. [¶] I have previously concluded that your comments about Coach Craft were factually false, not made in good faith and therefore not `protected disclosures.' The decisions to remove you as the strength and conditioning coach of the football team and restrict your hours in the weight room and on campus were based in part on these comments and therefore are not retaliatory. Further, in the summer of 2003, a movement existed within the SDSU Athletic Department, and specifically the football program, to remove you as strength and conditioning coach for football or not renew your employment with the University. Mr. Adler's report found that in his first meeting with [Bartow], Coach Craft stated that he wanted `his own people in the field,' wanted to develop his players' speed and quickness, and wanted `different strength and conditioning.' ... Although you were not removed as football strength and conditioning coach at that time, [Bartow] subsequently asked you to `voluntarily' relinquish your football responsibilities. When you refused, he removed you from any involvement with football and advised you [of your new work hours]. He further directed you to be out of the weight room by 2:00 p.m. daily. [¶] According to Mr. Adler, [Bartow] made this organizational change also because `the relationship between Coach Craft and Coach Ohton seems to be strained beyond a tolerable level.' Coach Craft knew from the time he was hired that you did not support his appointment, something you do not deny. Furthermore, he determined within a few months as coach that you were opposed to his retention of Offensive line coach, Damon Baldwin. The tension between you and Mr. Baldwin was apparent to the other coaches and to the players, and negatively impacted the football program. [¶] ... [¶] Mr. Adler corroborated Coach Craft's assertion that he wanted to change the emphasis of the football team's conditioning, that you were unwilling to support this change in emphasis, notwithstanding several chances to do so and that you had a general antipathy toward the coach, all of which predates the audit. All of these support the decision to replace you as strength and conditioning coach for the football team. I also note that you *1412 remain conditioning coach for the other teams, whose coaches are comfortable with this arrangement. I therefore conclude you were removed as strength and conditioning coach for the football team for independent legitimate non-retaliatory reasons." (Original italics.)
McClain determined the restriction of Ohton's hours in the weight room was retaliatory: "Mr. Adler concluded that the decision to restrict your hours in the weight room and on campus was based in part on comments contained in [the Ohton Report] as well as your refusal to `voluntarily' relinquish football. This decision was ostensibly to prevent you from interacting with football players. Mr. Adler, however, learned that the players practiced until 5:15 [p.m.] or later and were required to workout in the weight room after practice. He therefore concluded that this action was primarily punitive and in response to your nonprotected refusal to relinquish football. However, I have concluded you did engage in protected disclosure and since there is no legitimate reason for this action, I conclude changing your hours was retaliatory." (Original italics.) McClain added: "Upon re-examining Mr. Adler's report, the information you provided and additional information obtained in my review, I conclude your hours were restricted in `retaliation for protected disclosure' within the meaning of [EO 822]. [¶] Although the investigation of your complaint produced evidence of only minor retaliation for the protected activity, I am troubled by your continuing conflict with the athletic department administration. Therefore, I request that you and your legal representative, if you so choose, and SDSU officials appropriately resolve this matter so as to balance your need to work in a supportive environment with the University's goal of building the football program under the leadership of Coach Craft." (Original italics.)
On February 9, 2004, CSU "immediately rescind[ed] any prior instructions given by Interim Athletic Director Gene Bartow in August 2003 regarding the limitation of Mr. Ohton's hours of work and restrictions of his time on campus."

DISCUSSION

I.

We Decline to Reexamine Ohton I
Ohton invites us to reject our conclusion in Ohton I and instead find as a matter of law that he was not required to file a mandamus action in the trial court before being allowed to proceed with his civil action under section 8547.12. He contends the California Supreme Court in cases decided after Ohton I, supra, 148 Cal.App.4th 749, specifically Miklosy v. Regents of *1413 University of California (2008) 44 Cal.4th 876 [80 Cal.Rptr.3d 690, 188 P.3d 629] (Miklosy) and State Bd. of Chiropractic Examiners v. Superior Court (2009) 45 Cal.4th 963, 971 [89 Cal.Rptr.3d 576, 201 P.3d 457] (Arbuckle) has expressed its concern "that the CWPA is being applied to actually thwart the goal of that legislation," and he adds that this case is the "`poster child' for what is currently broken with that system." Moreover, he speculates that the California Supreme Court granted review in Runyon v. Trustees of California State University (Oct. 30, 2008, B195213) (nonpub. opn.), review granted Jan. 28, 2009, S168950, because: "Notably, although Runyon was an unpublished decision, its wholesale adoption of this court's rationale in [Ohton I] makes it, in many ways, a surrogate for review of [Ohton I] never pursued by either CSU or Coach Ohton."[3]
(1) "Our task is to construe the statute, not to discern trends." (Fukuda v. City of Angels (1999) 20 Cal.4th 805, 822 [85 Cal.Rptr.2d 696, 977 P.2d 693].) As we stated in Ohton I, we are required to interpret the statute to ascertain the Legislature's intent. (Ohton I, supra, 148 Cal.App.4th at p. 763.) We see no reason to abandon our previous interpretation.

II.

Standard of Review
The interpretation of statutes and ordinances "is ultimately a judicial function." (Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd. (1999) 70 Cal.App.4th 281, 290 [82 Cal.Rptr.2d 569].) An agency's interpretation of a statute is entitled to consideration and respect by the courts "`unless it is clearly erroneous or unauthorized.'" (Ibid.) We review an agency's interpretations of law and ordinances de novo. (Regents of University of California v. Superior Court (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808].)
When, as here, review is sought by means of ordinary mandate (Code Civ. Proc., § 1085), judicial review is limited to an examination of the proceedings before the agency to determine whether its action has been arbitrary, capricious, entirely lacking in evidentiary support, or not in accordance with law. (Strumsky v. San Diego County Employees Retirement Assn. (1974) 11 Cal.3d 28, 34-35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].) "In determining whether evidentiary support is present in a traditional mandamus action, the applicable *1414 standard of review is the substantial evidence test." (Taylor Bus Service, Inc. v. San Diego Bd. of Education (1987) 195 Cal.App.3d 1331, 1340 [241 Cal.Rptr. 379].)

III.

Good Faith Nature of Ohton's Disclosure
With respect to McClain's determination that Ohton did not act in good faith in reporting Craft's alleged drunkenness while at an out-of-state game and that his statement is therefore not a protected disclosure, we conclude, based upon the administrative record before the trial court, CSU applied an incorrect definition of good faith, and therefore the result reached was contrary to law.
(2) Section 8547.2 defines "protected disclosure" as used in section 8547.12 to mean "any good faith communication ... that discloses or demonstrates an intention to disclose information that may evidence (1) an improper governmental activity[4] or (2) any condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition." (§ 8547.2, subd. (d).)
(3) The CWPA does not define "good faith communication." However, section 8547.12, subdivision (a) provides that a CSU employee may file a written internal complaint "together with a sworn statement that the contents of the written complaint are true, or are believed by the affiant to be true, under penalty of perjury." This requirement is implemented in EO 822, section V, subdivision C.6, which states, "The complaint must be signed, dated, and contain a sworn statement that the contents of the written complaint are true, or are believed by the complainant to be true, under penalty of perjury." Further, EO 822, section VI, subdivision E states, "CSU employees are required to cooperate with the investigation and be completely honest in answering questions and providing information to the investigator(s)."
(4) We analyzed the phrase "good faith" in Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America (2005) *1415 133 Cal.App.4th 1319, 1339 [35 Cal.Rptr.3d 496]. "`[G]ood faith' does have a distinct meaning and purpose in the law.... [G]ood faith `suggests a moral quality; its absence is equated with dishonesty, deceit or unfaithfulness to duty.' [Citation.] Another authority has stated: `Good faith, or its absence, involves a factual inquiry into the plaintiff's subjective state of mind. [Citations]: Did he or she believe the action was valid? What was his or her intent or purpose in pursuing it? A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence.' [Citation.] ... `[T]he phrase "good faith" in common usage has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and generally speaking, means being faithful to one's duty or obligation.'" (Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America, at p. 1339.)
(5) We conclude that the good faith requirement for a protected disclosure is incorporated in EO 822, which implements section 8547.12 subdivision (a) by requiring a complainant to submit a sworn statement attesting his or her complaint is true or believed by the affiant to be true, under penalty of perjury, and to provide the investigator with honest information.
Before applying the above definition of "good faith," we first clarify we are not called upon to decide on the merits whether CSU reached a correct result following its investigation of the allegation that Coach Craft was seen drunk in public. Our statements are not to be construed as having any bearing on that issue. Rather, we address the separate question of Ohton's good faith basis for his allegation, and conclude CSU erred in concluding Ohton did not act in good faith.
(6) McClain stated the following in the final determination letter regarding Ohton's motive for disclosing the allegation that Craft was seen drunk in public: "Although Mr. Adler concluded your written audit statement addressed primarily a personal agenda and internal grievances regarding events that occurred many years ago, he did not conclude you were knowingly dishonest." (Italics added.) McClain did not dispute Adler's finding. Therefore, for CSU to conclude that Ohton did not have a good faith basis for reporting the allegations is on its face contradictory, and leads to the inference that CSU acted arbitrarily and capriciously.
(7) CSU's analysis of good faith is defective in other ways. Adler concluded Ohton did not act in good faith because Ohton's disclosure "was hearsay and fully refuted." However, that standard, logically extended, would require whistleblowers to report solely on matters they themselves perceived. *1416 We disagree that a whistleblower's reliance on hearsay precludes a finding the complaint was a good faith protected disclosure. Improper governmental activity is frequently difficult to uncover and whistleblowers will often need to rely on hearsay evidence, in part out of the informants' fears of reprisals. To impose on whistleblowers the burden of reporting solely their percipient knowledge would inhibit them from freely reporting improper governmental activity, thus undermining the statute's purpose. Separately, it cannot be the case under the CWPA that a lack of good faith may be imputed to the whistleblower because an investigation concludes an allegation of improper governmental activity was "fully refuted." Whether the disclosure is made in good faith is properly determined based on whether the complainant believed it was true or had reason to believe it was true at the time it was made. It is the investigator's role to act on the complaint and ascertain the truth or falsity of the complaint, and a postinvestigation conclusion that the complaint was unfounded does not necessarily mean the complaint was made in bad faith. (Accord, Pugh v. See's Candies, Inc. (1988) 203 Cal.App.3d 743, 770 [250 Cal.Rptr. 195] [finding "[e]ven an honest, though mistaken, belief that the employer for legitimate business reasons had good cause for the discharge would negate bad faith."].)
(8) McClain also determined Ohton's complaint was not made in good faith by reasoning backwards from Roush's finding that the allegation against Coach Craft was untrue. McClain additionally insinuated that Ohton made the allegations out of "a personal and vindictive agenda against Coach Craft." But whatever may be the truth of McClain's charge, section 8547.12 does not require the impossibly high standard that the complainant's motives be pure, or untainted by a personal or vindictive agenda. Rather, the statute merely requires an honest belief in the truth of the allegations.
Apart from applying an erroneous legal standard in defining a "good faith" disclosure, CSU's final determination letter omitted a critical fact in concluding Ohton's "statement was not made in good faith and is therefore not a `protected disclosure.'" CSU asserts in its reply brief: "Adler's conclusion was supported by the information he obtained through his investigation. He understood from Roush that [Ohton] admitted he only spoke to one booster, not a `few,' and that this booster was not at the Idaho game. Similarly, he understood that the two witnesses the booster identified did not corroborate Craft being drunk in Idaho. Also, the booster, who said that he saw Craft drunk in New Mexico, stated he did not want to be involved."
CSU's determination letter focused on Ohton's claim regarding the Idaho incident, but excluded what it now concedes: that one booster identified by Ohton told Roush he saw Craft drunk in New Mexico. This omission from the determination letter provides a distorted picture of what CSU knew from *1417 its own investigation, therefore undermining its conclusion that Ohton did not make a good faith report. We do not impute to Ohton a lack of good faith simply because that booster subsequently refused to become involved in CSU's investigation.
CSU's conclusion that Ohton did not act in good faith significantly impacted its analysis of Ohton's complaint as a protected disclosure, and his contention that his removal as a coach to the football team was retaliatory. Specifically, Adler concluded, "This accusation [that Craft was seen drunk in public] was not intended to `blow the whistle' on the specific conduct. The accusation was inserted as support for the general contention that athletic department travel was not being properly controlled and, thus, it is arguably a contention of economic waste or inefficiency. The specific personal allegation against Craft, however, does little to advance that general contention. The specific personal allegation against Craft is not a `protected disclosure'."
McClain stated in the determination letter to Ohton, "Mr. Adler concluded the decisions to remove you as strength and conditioning coach for the football team and restricting your hours on campus and in the weight room were based, at least in part, on specific comments contained in your written audit statement. Specifically, your factually false comments about the coach's intoxication at an away game were central to the University's decision to take the action it did. [¶] I have previously concluded that your comments about Coach Craft were factually false, not made in good faith and therefore not `protected disclosures.' The decisions to remove you as the strength and conditioning coach of the football team and restrict your hours in the weight room and on campus were based in part on these comments and therefore are not retaliatory." Each of these interpretations turned on CSU's erroneous interpretation of the good faith standard in section 8547.2. Absent those errors, CSU necessarily would have analyzed Ohton's complaint of retaliation based on his removal as coach to the football team differently, and possibly with a different outcome.

IV.

CSU's Determination Letter Failed to Address Punishment and Discipline
We further conclude that CSU's final determination letter did not satisfactorily address Ohton's complaint because it failed to identify the retaliators and address punishment and discipline. Section 8547.12 subdivision (b) provides, "Any person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a [CSU] employee, including an officer or faculty member, or applicant for employment for having made a *1418 protected disclosure, is subject to a fine not to exceed ten thousand dollars ($10,000) and imprisonment in the county jail for up to a period of one year. Any university employee, including an officer or faculty member, who intentionally engages in that conduct shall also be subject to discipline by the university."
Notwithstanding CSU's finding that Ohton's "hours were restricted in `retaliation for protected disclosure' within the meaning of [EO 822]" and despite section 8547.12, subdivision (b)'s provision for punishment and discipline, the determination letter failed to state whether any CSU employee or employees who intentionally retaliated against Ohton was punished or disciplined in any manner, and if not, why not.
(9) Section 8547.12 is structured to serve the purpose of the whistleblower statute, which is "`that state employees should be free to report waste, fraud, abuse of authority, violation of law, or threat to public health without fear of retribution.'" (Miklosy, supra, 44 Cal.4th at p. 885.) To effectuate the goal of protecting whistleblowers, section 8547.12, subdivision (b) makes retaliatory conduct a criminal offense and authorizes CSU to impose discipline, in addition to whatever criminal punishment might be pursued. Here, CSU found that retaliation occurred and dismissed it as "only minor," but we note that section 8547.12 makes no mention of "minor" retaliation. To the contrary, it expansively encompasses "acts of reprisal, retaliation, threats, coercion, or similar acts against a [CSU] employee." (§ 8547.12, subds. (a), (b) & (c).)
(10) The Legislature designated such retaliation as a criminal offense. Therefore, when CSU makes a finding of retaliation, to satisfactorily address the whistleblower complaint, its determination letter must state whether the matter was referred to criminal prosecution, and if not why not. Anything short of this defeats the protections created by the statute. Here, because of CSU's silence on the issue of punishment and discipline, CSU did not satisfactorily address Ohton's complaint.[5]
In view of our conclusion that CSU's final determination letter did not comply with law, we need not address the other issues Ohton raises on appeal.

*1419 DISPOSITION
The judgment is reversed. The trial court is directed to enter a new order granting Ohton's writ petition. David Ohton is awarded costs on appeal.
McConnell, P. J., and Huffman, J., concurred.
NOTES
[1] All further statutory references are to the Government Code unless otherwise stated. Section 8547.12, subdivision (c) provides: "In addition to all other penalties provided by law, any person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a university employee, including an officer or faculty member, or applicant for employment for having made a protected disclosure shall be liable in an action for damages brought against him or her by the injured party. Punitive damages may be awarded by the court where the acts of the offending party are proven to be malicious. Where liability has been established, the injured party shall also be entitled to reasonable attorney's fees as provided by law. However, any action for damages shall not be available to the injured party unless the injured party has first filed a complaint ... and the university has failed to reach a decision regarding that complaint within the time limits established for that purpose by the trustees. Nothing in this section is intended to prohibit the injured party from seeking a remedy if the university has not satisfactorily addressed the complaint within 18 months."

We grant CSU's request that the court take judicial notice of the legislative history for section 8547.12, subdivision (c).
[2] In 2002, CSU implemented section 8547 by issuing EO 822, which "establishes a procedure for responding to complaints filed with the Office of the Chancellor or CSU campuses by employees or applicants for employment who allege they have been retaliated against for having engaged in a protected disclosure under the California Whistleblower Protection Act." The purpose of EO 822 is "to provide a timely and effective procedure for the resolution of such complaints." Under EO 822, the vice chancellor of human resources is designated to receive and make decisions regarding written complaints of retaliation. At the vice chancellor's discretion, the investigation may be conducted by an external investigator. The complainant is obligated to cooperate with the investigator, and in an initial interview with the investigator has the opportunity to present a list of witnesses and documentary evidence in support of the complaint. The investigator must interview the complainant, review any supporting documentation supplied by the complainant and any response to the complaint supplied by the campus or employees alleged to have taken retaliatory action, interview witnesses, and take any other action the investigator deems appropriate. The investigation must be completed no later than 60 days prior to the expiration of 18 months from the date the complaint was filed. "The vice chancellor for human resources shall transmit the summary and conclusion of the investigation to the complainant within ten (10) days of the vice chancellor's receipt of them from the investigator(s). The complainant may file a written response to the summary and conclusion with the vice chancellor within fourteen (14) days of receipt of the summary and conclusion." Thereafter, "[t]he vice chancellor of human resources shall respond to the complainant with a letter of determination within fourteen (14) days of receipt of the complainant's written response or the expiration of the time limits for the complainant to file a response.... This letter of determination will constitute the final CSU decision regarding the complaint, pursuant to ... section 8547.12[, subdivision] (c)." (EO 822, § II, subd. I.)
[3] In Runyon, the California Supreme Court will decide: (1) Must a CSU employee exhaust administrative and judicial remedies with respect to a challenged administrative decision in order to bring a claim under the CWPA (§ 8547 et seq.)? (2) What standard governs the determination whether CSU has "satisfactorily addressed" the employee's internal complaint (§ 8547.12, subd. (c))?
[4] Section 8547.2, subdivision (b) defines "improper governmental activity" as "any activity by a state agency or by an employee that is undertaken in the performance of the employee's duties, ... whether or not that activity is within the scope of his or her employment, and that (1) is in violation of any state or federal law or regulation, including, but not limited to, corruption, malfeasance, bribery, theft of government property, fraudulent claims, fraud, coercion, conversion, malicious prosecution, misuse of government property, or willful omission to perform duty, or (2) is economically wasteful, or involves gross misconduct, incompetency, or inefficiency."
[5] Based on CSU's failure to address punishment and discipline, we need not address whether, once CSU has found retaliation, it is mandatory or discretionary for CSU to discipline the offending employee under section 8547.12, and whether in such an instance the determination letter must address CSU's reasons for either imposing or declining to impose discipline. We also note that EO 822 is silent on what CSU's obligations and procedures for discipline and punishment are upon a finding of retaliation. To that extent, EO 822 does not implement the statute regarding retaliatory conduct, which the Legislature has criminalized.